IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RUSSELL W. DOTSON, | ) | CASE NO. 3:15-cv-1874 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF THE SOCIAL | ) | THOMAS M. PARKER |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.      Introduction

Plaintiff, Russell W. Dotson ("Dotson"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits and Disability Insurance Benefits under Title XVI of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and the case be REMANDED for further proceedings consistent with this Report and Recommendation.

## II.      Procedural History

Plaintiff applied for supplemental security income and disability insurance benefits in 2011.  (Tr. 244-249; 269-283)  Mr. Dotson alleged his disability began on February 2, 2005. (Tr. 269)  Mr. Dotson's application was denied initially on February 8, 2012 (Tr.191-193) and after reconsideration on August 7, 2012. (Tr.195-196)  On August 20, 2012, Mr. Dotson requested an

administrative hearing. (Tr.197)

A hearing was held before the Administrative Law Judge ("ALJ"), Ellen Parker Bush, on December 17, 2013. (Tr. 14)  During the hearing, Dotson amended his alleged onset date to January 10, 2011 (Tr. 162; 268).  The ALJ issued a decision on June 10, 2014, finding that Dotson was not disabled.  (Tr. 159-190)  Dotson requested a review of the hearing decision on September 12, 2012. (Tr. 11-13)  The Appeals Council denied review, rendering the ALJ's June 10, 2014 decision final. (Tr. 1-5)

On September 14, 2015, Dotson filed an appeal of the ALJ's final decision in this court. (Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on November 20, 2015. (Docs. 5 and 6)  Dotson filed his brief on the merits on January 19, 2016 (Doc. 10) and Defendant filed its brief on the merits on March 3, 2016 (Doc. 11), making the matter ripe for review.

## III.    Evidence

### A.  Personal, Educational and Vocational Evidence

Russell W. Dotson was born on September 8, 1975 and was 36 years old on the date his application was filed.  (Tr. 244)  Dotson has been married since 1999 and has three children. (Tr. 269-270.)  He has a limited education (Tr. 182.)  Mr. Dotson previously worked as a farm laborer and a machine feeder off-bearer.  (Tr. 182)

Mr. Dotson completed the 10th grade and was in special education classes throughout school.  (Tr. 421)  He received poor grades, did not get along with his teachers, and had disciplinary issues.  (Tr. 421)  Plaintiff did not obtain a GED.  (Tr. 421)

### B.  Medical Evidence

#### 1.  Relevant Medical Records

Plaintiff claims both physical and mental impairments.  He has been diagnosed with lumbar disc disease including bulging at L3-4 and L4-5.  (Tr. 439-440)  He also has mild degenerative arthritis in both knees.  (Tr. 442-443)  Plaintiff could not complete physical therapy because he felt that there were too many people around and reported severe panic issues.  (Tr. 637)  Plaintiff received two facet injections. (Tr. 619, 676)  He also underwent radiofrequency ablation.  (Tr. 673)  Plaintiff does not want to pursue a surgical procedure.  (Tr. 682)

Plaintiff sought treatment with Christina Jaworski, CNP, in January 2012 and requested that she complete paperwork for his disability claim.  (Tr. 639)  He also reported increased anxiety to the point where he did not like to leave the house and would experience extreme anxiety about social situations and being around people that he did not know.  (Tr. 639)  He reported that he was getting poor sleep and that he was picking his skin.  (Tr. 639)  Ms. Jaworski diagnosed generalized anxiety/panic disorder and small sores on the arms and abdomen from picking at his skin.  (Tr. 639)  She prescribed medication for his mental health issues.  (Tr. 505)

Plaintiff saw Ms. Jaworski again in February 2012.  (Tr. 638)  Plaintiff reported that the psychotropic medication (BuSpar) he had been taking was not working.  (Tr. 638)  He complained of anxiety and poor sleep. (Tr. 638)  He reported continued picking at his skin. (Tr. 638)  Ms. Jaworski adjusted plaintiff's medication and advised him to follow up in three to four weeks.  (Tr. 638)

Plaintiff presented to Marlys J. Reetz, Ph.D., on March 14, 2012.  (Tr. 601-604)  Plaintiff sought treatment for his social phobia and anxiety. (Tr. 601)  Plaintiff reported social phobia so severe that he would become almost immobile due to anxiety in social settings.  (Tr. 601)  Due to

3

his anxiety, plaintiff was accompanied by his wife at the evaluation.  (Tr. 601)  Plaintiff reported

that he had no social goals, but noted that he felt safe around his wife's family and enjoyed

spending time with his own family at home.  (Tr. 602)   However, plaintiff reported that he did

not attend any of his children's school activities due to his social phobias.  (Tr. 602)  Dr. Reetz

noted that plaintiff's mood was normal and his memory appeared unimpaired.  (Tr. 603)  Dr.

Reetz diagnosed social phobia, depression NOS, and noted that plaintiff's primary problem was

social anxiety.  (Tr. 604)  Dr. Reetz assessed a GAF score of 35-40.  (Tr. 603)  Dr. Reetz

recommended that plaintiff engage in cognitive and behavioral supportive therapy.  (Tr. 604)

In a follow up appointment with Dr. Reetz two weeks later, plaintiff reported that it had

been hard to come for the second appointment.  (Tr. 605)  Plaintiff attended a final appointment

with Dr. Reetz on April 13, 2012. (Tr. 605)  At this appointment, Dr. Reetz questioned whether

plaintiff's inability to manage anxiety could have come from his brain injury. (Tr. 605)  She

referred plaintiff for a neurological evaluation.  (Tr. 588)  Plaintiff's file with Dr. Reetz was

closed in June after plaintiff failed to call for two months for a follow-up appointment.  (Tr. 605)

In June 2012, plaintiff sought treatment from Khalid Mahmood, M.D., to determine

whether his psychological symptoms were stemming from neurological issues.  (Tr. 588)  An

EEG of plaintiff's brain revealed normal results.  (Tr. 592)

In April 2013, plaintiff presented to Dr. Elrukar, M.D., for anxiety and emotional control.

(Tr. 661)  Plaintiff reported being unable to leave his house.  (Tr. 666, 667)  Dr. Elrukar advised

plaintiff to make a follow-up appointment.  (Tr. 668)  Plaintiff represents that he continued to

treat regularly with Dr. Elrukar and Ms. Jaworski through the date of the ALJ hearing.

### C.  Opinion Evidence

#### 1.  Treating Psychiatrist – Ruth Elrukar – January 2014

Ruth Elrukar, M.D., plaintiff's psychiatrist, provided a medical source statement on

January 22, 2014.  (Tr. 719)  Dr. Elrukar opined that plaintiff has moderate impairments in his

ability to understand and remember simple instructions, and extreme impairments with respect to

his abilities to carry out simple instructions, make judgments on simple work-related decisions,

understand and remember complex instructions, carry out complex instructions, and make

judgments on complex work-related decisions.  (Tr. 719)  Dr. Elrukar based her assessments on

plaintiff's social phobia and chronic outbursts of temper.  (Tr. 719)  Dr. Elrukar stated that

plaintiff had chronic PTSD, had been diagnosed with bipolar depression and was on lithium

therapy. (Tr. 719)  She assessed plaintiff's ability to respond to stress in the work place and

interact appropriately with the public, co-workers, and supervisors as markedly limited.  (Tr.

720)  She based this opinion on plaintiff's inability to tolerate stress, difficulties with

concentration, poor patience, outbursts of temper and social phobia.  (Tr. 720)

#### 2.  Treating CNP – Christina Jaworski – January 2014

Ms. Jaworski completed a Medical Source Statement of Ability to Do Work Related

Activities in January 2014.  (Tr. 709-718)  She opined that plaintiff should avoid high humidity

because it caused excessive sweating, which would impact the levels of the medications plaintiff

took for depression, anxiety, anger issues, OCD, bipolar disorder.  (Tr. 713)  She also stated that

plaintiff could not shop, travel, or use public transportation without the help of his wife who

accompanies him on all his outside visits.  (Tr. 714)  Ms. Jaworski opined that plaintiff

communicated poorly with others and avoided eye contact, which would affect his ability to get

along with others at work. (Tr. 714)  She assessed that plaintiff was markedly limited in his

ability to understand and remember complex instructions as well as his ability to carry them out

or make judgments on them.  (Tr. 716)  She opined that he was moderately limited in his ability

to understand, remember, carry out and make judgments on simple instructions. (Tr. 716)  She

assessed him as extremely limited in his ability to interact appropriately with the public,

supervisors, and co-workers; as well as in his ability to deal with routine changes in work setting.

(Tr. 717)

### 3.  Consulting Psychologist – Michael W. Firmin – Ph.D. – June 2011

Michael W. Firmin, Ph.D., performed a consultative, psychological evaluation of plaintiff

on June 21, 2011.  (Tr. 420-427)  Plaintiff told Dr. Firmin that he was unable to work because he

was paranoid, a perfectionist and had a social phobia.  (Tr. 420)  Plaintiff told Dr. Firmin that his

mental impairments had first presented when he as a teenager but that he had never received any

counseling or treatment.  (Tr. 421)  Plaintiff was prescribed psychotropic medications but did not

feel that they had been successful.  (Tr. 421)  Dr. Firmin noted that the claimant's facial

expressions during the exam were anxious and nervous and that his eye contact was avoidant.

(Tr. 422)  His mood was generally worried and nervous.  (Tr. 422)  He demonstrated outward

signs of sighing, fidgeting, and leg shaking.  (Tr. 422)  Plaintiff's thought processes were

pessimistic but there was no sign of drug or medication impairment.  (Tr. 422)  Plaintiff reported

notable symptoms of anxiety in the past six months and stated that a cause for his anxiety was

being around people. (Tr. 422)  He also reported experiencing unexpected panic attacks.  (Tr.

422)  There was no indication of any delusions, obsessive thoughts, phobias, or hallucinations.

(Tr. 423)  Plaintiff's memory recall was stated as adequate, but his abstraction ability was below

average.  (Tr. 423)  Dr. Firmin diagnosed plaintiff with depression, not otherwise specified, and

social phobia. (Tr. 424)  He opined that plaintiff had no difficulty in understanding written or

6

verbal instructions or completing multi-step tasks. (Tr. 425)  Dr. Firmin opined that plaintiff could perform work related tasks given the wide array of daily activities he managed, including playing games, using the computer, heating up frozen food, navigating automated phone services when making phone calls, looking up professionals in the Yellow Pages, taking medications without prompting or assistance, and following the instructions to bring his medications to the appointment.  (Tr. 425)  Dr. Firmin believed that plaintiff would struggle to maintain attention, concentration, and persistence more than two hours at a time, but noted that he had never encountered any problems at work for falling behind.  (Tr. 425)  Dr. Firmin also felt that plaintiff would struggle with responding appropriately to supervisors and coworkers in a work setting and in responding appropriately to pressures in the workplace.  (Tr. 425-426)  Plaintiff reported getting upset when stressed.  (Tr. 426)  For example, plaintiff stated that his wife managed their funds because he was worked he would "mess up." (Tr. 426)  Dr. Firmin noted some potential work related abilities suggested, by implication, in plaintiff's daily activities, which were reported as: engaging in conversations, returning phone calls, keeping a calendar for appointments, paying the right amount of money and counting change, talking with family members nearly every day, following directions in order to get to a new location, and accurately following directions to assemble simple things.  (Tr. 426)  Dr. Firmin opined that plaintiff's symptoms were moderate and noted that plaintiff described serious functional deficits.  (Tr. 424)

### 4.  Consulting Psychologist – J. Bruce Kelly, M.Ed. – January 2012

Consulting Psychologist, J. Bruce Kelly, M.Ed., examined plaintiff on January 30, 2012 and provided a consultative evaluation.  (Tr. 545-554)  Plaintiff was driven to the appointment by his wife.  (Tr. 547)  Plaintiff reported that he avoids driving due to road rage.  (Tr. 547)  Plaintiff presented as resistant, reluctant, angry, and terse.  (Tr. 548)   Dr. Kelly reported that

plaintiff's speech was normal as were his memory registration and recall.  (Tr. 550)  Plaintiff's

cognitive function was below average.  (Tr. 552)   Dr. Kelly opined that plaintiff had a below

average ability to maintain concentration.  (Tr. 552)  He further had a decreased ability to

respond to supervisors and coworkers in a work setting.  (Tr. 553)  Dr. Kelly based this opinion

on plaintiff's guarded manner throughout the examination, insistence that his wife remain with

him during the interview, avoidance of eye contact and terse responses.  (Tr. 553)   With regard

to the ability to respond appropriately to pressures in a work setting, Dr. Kelly stated:

> He has some mental health issues.  He reports dealing with stressors by becoming
> angry and in general avoiding social situations.  He did report a history of
> psychological inability to adjust to workplace demands.  There is reported history
> of mental or emotional deterioration in response to work exposure.  He is not
> expected to generally respond appropriately psychologically to normal workplace
> pressure.

(Tr. 553)  Dr. Kelly diagnosed plaintiff with anxiety disorder NOS and personality

disorder/mental retardation.  (Tr. 551-552)

### 5.   Reviewing Physicians/Psychiatrists

#### a.   Vicki Warren, Ph.D.

Vicki Warren, Ph.D. reviewed plaintiff's records on behalf of the state agency in

February 2012.  (Tr. 106)  Dr. Warren opined that plaintiff had mild restrictions in his activities

of daily living, moderate difficulties with maintaining social functioning, and moderate

difficulties in maintaining concentration, persistence or pace.  (Tr. 105)  She opined that there

was no evidence that plaintiff's symptoms established the presence of the "C" criteria for mental

impairments.  (Tr. 106)  Dr. Warren opined that plaintiff was capable of carrying out short,

simple instructions, but was moderately limited in carrying out detailed instructions or

maintaining attention and concentration for extended periods.  (Tr. 109-110)  She opined that

8

plaintiff would be moderately limited in his ability to work with others without being distracted; and moderately limited in his ability to complete a normal workday and workweek without interruptions due to his psychologically based symptoms. (Tr. 110) She felt that he would be able to complete low stress tasks which do not require fast paced production or high production quotas. (Tr. 110) She further opined that he was markedly limited in his ability to interact appropriately with the general public, moderately limited in his ability to ask simple questions or accept instructions, and moderately limited in his ability to get along with coworkers or peers without distracting them. (Tr. 110) Dr. Warren recommended that plaintiff's work be limited to a setting without public interaction, which required no more than superficial contact with co-workers. (Tr. 110) She opined that plaintiff would also need to work at a static job where changes in his job duties were infrequent. (Tr. 111)

### b. Reviewing Psychologist, Aracelis Rivera, Psy.D.

Aracelis Rivera, Psy.D., reviewed plaintiff's file on August 6, 2012 and affirmed the opinion of Dr. Warren. (Tr. 126-127)

### D. Testimonial Evidence

#### 1. Jennifer Dotson's Testimony

A hearing took place in this matter on September 12, 2013. (Tr. 14) Mr. Dotson was represented by counsel at the hearing. (Tr. 19) Also present was Mr. Dotson's spouse, Jennifer Dotson. (Tr. 14) At the beginning of the hearing, through counsel, Mr. Dotson amended his onset date from February 2, 2005 to January 10, 2011. (Tr. 20) Counsel for Mr. Dotson also requested that the testimony of Dotson's wife be taken first. (Tr. 23)

Ms. Dotson testified that she and Mr. Dotson have been married for 15 years and have three children, ages 16, 13 and 9. (Tr. 25) She works third shift at a plastic factory and uses the

9

family's only car to drive to and from work since her husband does not have a driver's license. (Tr. 26-27)  Ms. Dotson testified that their family moved to Florida but returned to Ohio after Mr. Dotson could not find a job because he did not have a proper education.  (Tr. 28)  She stated that upon return to Ohio, Mr. Dotson was to start a new job but became physically ill.  (Tr. 29)

Ms. Dotson admitted to filling out forms on behalf of her husband because she remembers more of his information than he does.  (Tr. 29)  She further testified that he gets words jumbled when he reads.  (Tr. 31)  Ms. Dotson stated that she is the parent that helps the children with their homework.  (Tr. 32)

Ms. Dotson testified that her husband worked at a mill factory when they were first married in 1999.  (Tr. 33-34)  At that time, he had his driver's license and drove a dump truck from the fields to the plant.  (Tr. 35)  She testified he left that job in 2005 because the position was given to a gentleman with less experience than her husband. (Tr. 35)  It was then that she told him to stay home and she would go to work.  (Tr. 36)

While she was at work, Mr. Dotson would watch their children, make their meals and watch them play in the yard.  (Tr. 38)  She stated Mr. Dotson did not do other household chores such as laundry or cooking but that he did all of the yard work.  (Tr. 38)  Mr. Dotson would never leave the house but would have friends over for a visit.  (Tr. 38)

When their youngest son was five years old, they agreed that Mr. Dotson should start working again and contacted a temporary agency to assist him in finding a job.  (Tr. 39)  Ms. Dotson testified that Mr. Dotson became physically ill and afraid to go outside a few hours prior to when he was to leave for his new job.  (Tr. 39)

Ms. Dotson stated that they do not go out to socialize (such as movies, church or bowling) except for occasionally going out for their wedding anniversary, though she clarified

10

that they had not even done that for the past three years.  (Tr. 40)  Ms. Dotson testified that it had

been years since Mr. Dotson attended one of their children's school activities because he does

not like to be around people.  (Tr. 40)

Ms. Dotson stated that Mr. Dotson would hide in the bedroom if more than five people

other than their immediate family members were in the house.  (Tr. 41)  She testified that Mr.

Dotson's face will get red, his leg will shake, he will start to stutter, he will pick at his skin and

he will twist a ball of string between his fingers when he is around too many people.  (Tr. 42)

In approximately 2012, Ms. Dotson stated that Mr. Dotson voluntarily chose not to renew

his driver's license because he gets too angry behind the wheel.  (Tr. 43)  He also gets angry

when he has to go places outside of their home.  (Tr. 43)  She also testified that it had been

several years since Mr. Dotson had any contact with his family.  (Tr.  44)

Ms. Dotson described a situation with a neighbor wherein her husband could not control

his anger and was verbally yelling at an officer who had been called to the scene.  (Tr. 45-46)

She described herself as a "stop button" for Mr. Dotson when he gets angry.  (Tr. 46)

Lastly, Ms. Dotson testified that she works third shift so that she can be available to help

with appointments for Mr. Dotson as well as their children.  (Tr. 46)

### 2.  Russell Dotson's Testimony

After Ms. Dotson testified, plaintiff testified at the hearing. (Tr. 48)  Plaintiff could not

remember the last time he drove a car.  (Tr. 48)  He stated that his wife fills out applications or

forms on his behalf because he has arthritis in his hands.  He related his arthritis to teachers who

would make him write things over and over.  (Tr. 49)  He reported that he has no trouble reading

forms, but that it is too painful for him to straighten out his fingers.  (Tr. 49)

11

In the sixth grade, Mr. Dotson recalls learning that he needed special education.  He stated that no one really cared about him which is why he had difficulty in school.  (Tr. 50)  He testified that he remained in special education classes until approximately seventh grade, when he got tired of people picking on him for being in that class.  (Tr. 51)  Mr. Dotson did not participate in any sports because his family was poor.  (Tr. 51)

Mr. Dotson stated that he previously did general labor and press operator work through a temporary service from approximately 1994 through 1995.  (Tr. 53)  He stated he was fired from the press operator job because the employees "had it out" for him.  (Tr. 53)  He described the press operator job as using hand truck or a tow motor to "move stuff."  (Tr. 54)  He further described the press operator position as somebody who stands at the machine and feeds the machine.  (Tr. 55)  Mr. Dotson stated that because he would exceed the required quota on the press machine, "[a]ll the old people have it out for you."  (Tr. 56)  As a result, he was "dismissed out of the place."  (Id.)  He testified that he pushed or pulled a couple hundred pounds once a night at that job.  (Tr. 56-57)

Mr. Dotson also worked as a press operator at Sunseed in approximately 1997.  His duties included lifting one pound bags of seed off of a machine and putting them into a box.  He described this as a light job and explained that he had no problems doing the tasks or meeting the quota.  (Tr. 58-59)  Mr. Dotson testified that he was forced to resign because of an argument with his boss and four employees.  (Tr. 59)

In 1998, Mr. Dotson testified that he did general labor work for Yarnell, an alfalfa mill.  (Tr. 59)   He did not have any difficulty operating a dump truck, the loader or the tractor used for this position.  (Tr. 61)  However, he testified that he did not like the people he worked with or where they came from.  (Tr. 61)  Mr. Dotson testified that he was a supervisor of sorts during the

12

night shift. (Tr. 62-63)  He further stated that he was promised a full time position at this mill but the job had been given to someone with less seniority so he had left without first discussing it with anyone else.  (Tr. 64)

When questioned, Mr. Dotson stated that he can no longer work on cars and trucks.  (Tr. 65)  He testified that he would spend up to an hour and a half to two hours a day maintaining the machinery he worked on at his previous employers.  (Tr. 65)

Mr. Dotson testified that the problem that most severely affected his ability to work was:

A. "Well, not wanting to deal with people.  I'm not wanting to talk with people.  I just plain out - - if you want to argue, I'm going to hurt you.  I'm not playing around no more."

Q. "Okay.  Well what about people who don't want to argue, and people who don't want to hurt you?

A.  Well, they all do.  They all do.  They all want to vie you dirty-assed looks or, you know - - sorry for the A word, but I'm a little stressed out.

(Tr. 66)

Mr. Dotson testified that Dr. Elrukar told him that he could not work but the he did not have a statement in writing to that effect.  (Tr. 67)  Mr. Dotson sees Christina Jaworski, a nurse practitioner in the office of Dr. Bell, his family physician, for medications.  (Tr. 68)  Mr. Dotson stated that he does not see Dr. Bell because he has a problem with men.  (Tr. 68)  Ms. Jaworski informed Job and Family Services that Dotson was unable to work due to anxiety and chronic pain. (Tr. 69)   Dotson claims that Job and Family Services was trying to push him out in the public to work.  Dotson denied any other doctors telling him that he could not work, but he felt that someone with bipolar should not be working.  (Tr. 70)

Mr. Dotson stated that none of the medications he is currently taking have side effects.  (Tr. 71)  However, he also testified that they have not been helpful lately.  (Tr. 71)  Dotson

13

further stated that the most severe pain he experiences is in his lower back and that nothing reduces the pain.  (Tr. 72)  He testified that he is lucky if he gets seven hours of sleep in a whole week because of mental issues.  (Tr. 73)  The three weeks prior to his hearing caused Mr. Dotson to lose a significant amount of sleep.  (Tr. 73)

During the day, Mr. Dotson stated that he gets up with the kids prior to them going to school.  (Tr. 74)  The rest of the day, he will sweep the house and do laundry but does not do any yard work.  (Tr. 75)  He does use a computer to send emails but not for any other purpose.  (Tr. 75)  Mr. Dotson stated that he does not check his kids' online school activities because he does not like the town he lives in or the school district.  (Tr. 76)

Mr. Dotson testified that he does not require assistance with personal hygiene such as showering or dressing himself.  However, he does not brush his teeth because he does not have any teeth to brush.  (Tr. 76)  Dotson further testified that he will not shower for days when he's feeling depressed.  (Tr. 76)

Dotson denied smoking or drinking alcohol.  (Tr. 77)  Dotson further testified that he does not leave the house even to get the mail.  (Tr. 77)  He also stated that he cannot stand in one spot for more than five minutes or his back pain will make it difficult to walk the rest of the day.  (Tr. 78).  Dotson stated that sitting does not make his back pain worse but it does not make it feel any better.  (Tr. 78)  He does not have any difficult climbing stairs but has problems going down stairs, so he does not use the stairs in his own home. (Tr. 80)

Dotson testified that he has had pain/discomfort in his stomach since he was in seventh grade.  (Tr. 82)  The pain has gotten worse in recent years and it causes him to use the bathroom every half hour. (Tr. 82)  These symptoms are brought on more when he stands.  (Tr. 82)  He

14

stated that he has seen several gastrointestinal doctors about this issue but was unsatisfied with their treatment.  (Tr. 83)

Mr. Dotson stated that he does not go out in his backyard because his neighbors want to "mess with him."  (Tr. 84)

### 3.  Vocational Expert's Testimony

Vocational Expert ("VE"), Jacquelyn D. Schabacker, testified at the hearing.  (Tr. 85-97) For the first hypothetical question, Ms. Schabacker was instructed to consider a hypothetical individual who has the ability to lift 10 pounds frequently, 20 pounds occasionally; stand or walk for four hours, sit for six hours, and occasionally use stairs, ramps, ladders, ropes, scaffolds, stoop, kneel, crouch, crawl, frequently balance and occasionally be exposed to environments with unprotected heights and moving machinery and no commercial driving.  (Tr. 87)

In response, the VE testified that such a hypothetical person could not perform Mr. Dotson's past work.  (Tr. 87)  However, the VE opined that the individual would be able to perform other jobs in the national economy such as light, unskilled inspection positions, with 2,000 local jobs and 80,000 national jobs.  (Tr. 87)  She also testified that the individual would be able to perform cashier positions with 1,400 local jobs and 350,000 national jobs as well as office helper positions with 300 available jobs in the local economy and 15,000 nationally.  (Tr. 87)  The VE stated that none of these positions required reading or writing at a level greater than sixth grade.  (Tr. 88)

The VE was then asked if the same hypothetical individual could perform any of the past work of Dotson or the other jobs proposed by the VE with the following mental limitations: "The individual could understand, carry out and remember simple instructions, where the pace of productivity is not dictated by an external source over which the individual has no control, such

as an assembly line or conveyor belt.  The work is repetitive from day to day with few and expected changes.  There is no interaction with the general public, only occasional interaction with coworkers and supervisors and not working in a team or with coworkers." (Tr. 88)   The VE testified that Mr. Dotson's past positions could not be performed and that the cashier and officer helper positions would also have to be eliminated.  (Tr. 88)

Next, the VE was asked to assume that the physical capacity of the hypothetical individual was reduced to lifting ten pounds, occasionally, lifting less than ten pounds frequently, standing and walking for four hours, sitting for six hours; avoiding concentrated cold and vibration, occasionally around unprotected heights and machinery, with the same mental limitations as stated in hypothetical number two.  (Tr. 89)   The VE testified that the hypothetical individual would not be able to perform the past positions of Dotson and all of the other positions available to the hypothetical individual in the first question would also be eliminated. (Tr. 89)  When questioned by the ALJ whether any other jobs could be performed by this hypothetical individual, the VE  stated that a sedentary inspection position could be performed with 1,000 jobs available in the local economy and 50,000 in the national economy.  (Tr. 89) The VE further testified that a sorter position would be available with 1,000 jobs available in the local economy and 50,000 in the national economy, as well as addresser positions with 200 such jobs in the local economy and 25,000 in the national economy.  (Tr. 90)

The VE also stated that these positions would not be eliminated at the sedentary level if the hypothetical individual needed to change his or her position every 30 minutes for one to two minutes.  (Tr. 90-91)  The VE further testified that ordinary employers tolerate no more than one missed work day per month for an unskilled job and expect their employees to be on task 90% of the time. (Tr. 93)

16

Next, the attorney for Mr. Dotson questioned the VE as to whether the potential positions would involve interaction with a supervisor to which the VE said, "yes."  (Tr. 92)  Mr. Dotson's attorney also asked the VE whether these positions would involve interaction with coworkers. The VE stated that interaction with coworkers would be superficial such as seeing a coworker in the cafeteria but would not be required to perform the job duties.  (Tr. 92)  The VE confirmed that these positions would be performed in a building and not outside but that the number of potential coworkers would vary from employer to employer.  (Tr. 93)  The VE also clarified that, when she testified to a worker being on task 90% of the time, bathroom breaks were excluded. (Tr. 93)

## IV.     Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV.    The ALJ's Decision

The ALJ issued a decision on June 10, 2014. A summary of her findings is as follows:

1. Dotson has not engaged in substantial gainful activity since April 26, 2011, the re-opened application date. (Tr. 165)

2. Dotson has the following severe impairments: lumbar disc disease; mild osteoarthritis, bilateral knees; morbid obesity; anxiety disorder NOS; and personality disorder. (Tr. 165)

18

3. Dotson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 166)

4. Dotson has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 416.967(b) with the ability to lift up to 10 pounds, less than 10 pounds frequently, stand and/or walk for 4 hours and sit for 6 hours of an 8-hour workday.  He can occasionally climb ladders, ropes, scaffolds, stairs, and ramps, stoop, kneel, crouch, and crawl and frequently balance.  He can only occasionally be exposed to workplace hazards such as unprotected heights and moving machinery with no commercial driving.  He must avoid exposure to environments with concentrated cold and vibration. He can understand, remember and carry out simple instructions where the pace or productivity is not dictated by an external source over which he has no control such as an assembly line or conveyor belt; where the work is repetitive from day to day with few and expected changes; and where the claimant does not have to interact with the general public at all and needs to only occasionally interact with coworkers and supervisors, with no working in a team or in tandem with coworkers. (Tr. 168-169)

5. Dotson is unable to perform any past relevant work.  (Tr. 182)

6. Dotson was born on September 8, 1975 and was 35 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date. (Tr. 182)

7. Dotson has a limited education and is able to communicate in English.  (Tr. 182)

8. Transferability of job skills is not material because the framework of the Medical-Vocational Rules support a finding that claimant is not disabled whether or not the claimant has transferable job skills. (Tr. 182)

9. Considering Mr. Dotson's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.  (Tr. 21)

Based on the foregoing, the ALJ determined that Dotson had not been under a disability

from April 26, 2011, the date the re-opened application was filed.  (Tr. 183)

## V.    The Parties' Arguments

Plaintiff filed his brief on the merits on January 19, 2016.  (Doc. 10)  Plaintiff argues that

19

the ALJ failed to properly evaluate whether plaintiff's mental health conditions functionally equal the paragraph "B" criteria set forth in listings 12.04, 12.06 and 12.08.  (Doc. 10, p. 12-13) He also contends that the ALJ did not properly evaluate the paragraph "C" criteria for those listings.  (Doc. 10, p. 13-15)  Plaintiff also argues that the ALJ did not afford proper weight to the opinions of Christine Jaworski, CNP and Ruth Elrukar, M.D. (Doc. 10, p. 10-11)   Finally, plaintiff contends that the ALJ failed to afford the proper weight to the testimony of plaintiff's wife.  (Doc. 10,  p. 11-12)

Defendant filed a brief on March 3, 2016. (Doc. 11)  Defendant argues that the ALJ properly evaluated the "B" and "C" criteria for listings 12.04, 12.06 and 12.08.  (Doc. 11, p. 9-19) Defendant also contends that the ALJ reasonably weighed the medical opinion evidence and the testimony from plaintiff's wife. (Doc. 11, p. 19-23)  The court has considered the parties' arguments and its recommendation is stated below.

## VI.    Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v.*

21

*Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D.

Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist.

LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. Whether Plaintiff's Diagnosed Mental Health Conditions Meet or Medically Equal the Criteria for Listings 12.04, 12.06, and 12.08.

Plaintiff argues that the ALJ erred in finding that his mental impairments did not meet or

medically equal the criteria for Listings 12.04, 12.06 or 12.08.  (Doc. 10, p. 12-16)  In order to

qualify as "disabled" under a Listing in the Secretary's regulations, a claimant must demonstrate

that he or she meets all of the criteria contained in the Listing.  *See Duncan v. Sec'y of Health &*

*Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986)  Alternatively, "[a] claimant can demonstrate

that she is disabled because her impairments are equivalent to a listed impairment by presenting

'medical findings equal in severity to all the criteria for the one most similar listed impairment."

*Foster v. Halter,* 179 F.3d 348, 355 (6th Cir. 2001).  "This decision must be based solely on

medical evidence supported by acceptable clinical and diagnostic techniques."  *Land v. Secretary*

*of Health and Human Services,* 814 F.2d 241, 245 (6th Cir. 1986).

Mr. Dotson contends that the ALJ failed to properly evaluate whether one or more of his

mental impairments met the Part B criteria for Listings 12.04, 12.06 and 12.08.  Part B of each of

these listings is met if the evidence demonstrates at least two of the following:

1.  Marked restriction of activities of daily living; or

22

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, Listings 12.04, 12.06, and 12.08.  "A marked limitation may

arise where several activities or functions are impaired or even when only one is impaired, as

long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to

function independently, appropriately, effectively, and on a sustained basis." *Rabbers v.

Comm'r of Soc. Sec.,* 582 F.3d 647, 652-53 (6th Cir. 2009).

In *Young v. Secretary of HHS,* 925 F.2d 146, 150 (6th Cir. 1990), the Sixth Circuit held

that an ALJ could properly find that the daily activities of a claimant who was capable of taking

care of her personal needs, dusting, cleaning, cooking, reading, and running errands were "no

more than slightly restricted."   In *Potter v. Comm'r of Soc. Sec.* 223 F.App'x 458, 465 (6th Cir.

2007), the Sixth Circuit affirmed the ALJ's finding of "mildly limited" restrictions in activities

of daily living where there was evidence that a claimant could attend to personal hygiene,

perform household chores, do laundry and watch television.

Here , the ALJ found that plaintiff was only mildly restricted in activities of daily living

such as  cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a

residence, caring for personal hygiene, using the telephone and directories, and using the post

office.  (Tr. 166-167)  The ALJ noted that plaintiff reported that he was a "stay at home" dad

who performed laundry, cleaning, vacuuming, cooking and taking care of anything inside the

house.  (Tr. 167) Plaintiff also reported that he was able to order take-out food, use a computer,

take medications without assistance and follow directions to get to a new location. (Tr. 167)

Plaintiff reported that he enjoyed watching wrestling on TV and interacting with his wife and

children.  (Tr. 167)  These were the facts to which the ALJ pointed in support of her finding of mild restrictions in activities of daily living. The undersigned finds that the ALJ's finding of mild restrictions in activities of daily living was supported by substantial evidence in the record.

The ALJ found that plaintiff had marked difficulties in maintaining social functioning. (Tr. 167)  However, she determined that plaintiff had only moderate difficulties in maintaining concentration, persistence or pace.  (Tr. 167)  In support of the latter finding, the ALJ pointed to the following: "* * * at the consultative examinations conducted in June 2011 and January 2012, the claimant reported no difficulty understanding, remembering or following instructions, including simple and multi-step tasks.  The claimant reported that he was able to operate a computer, follow a recipe, follow directions to get to a new location, take medication without assistance, maintain a calendar for appointments and maintain attention to task.  The claimant also reported that he deals with stress by playing video games." (Tr. 167-68)

Plaintiff argues that Ms. Jaworski and Dr. Elrukar assessed that he had marked limitations in concentration, persistence or pace.  He argues that it was error for the ALJ to find otherwise.  With regard to Dr. Elrukar, the undersigned recommends that the court should find that the ALJ failed to articulate good reasons for assigning little weight to her opinion, as further explained below.  While the record may support the ALJ's finding that plaintiff had moderate limitations in concentration, persistence or pace, a more specific explanation as to her assignment of little weight to Dr. Elrukar's opinion is needed.

Finally, the ALJ determined that plaintiff had suffered no episodes of decompensation. (Tr. 168)  Plaintiff does not argue that the record supports a finding of episodes of decompensation and has not pointed to any evidence in the record showing any such episodes.

The ALJ found that the evidence only demonstrated that plaintiff had met one of the four

24

part B criteria for the listings of 12.04, 12.06 and 12.08.  As is further explained below, the

undersigned is recommending a remand of this matter which may impact the ALJ's findings

related to these listings.

Plaintiff also argues that the ALJ failed to properly evaluate the part C criteria outlined in

listings 12.04 and 12.06.  The criteria of part C for listing 12.04 is met when the medical

evidence demonstrates the following:

[A] medically documented history of a chronic affective disorder of at least 2 years'
duration that has caused more than a minimal limitation of ability to do basic work
activities, with symptoms or signs currently attenuated by medication or psychosocial
support, and one of the following:

(1) Repeated episodes of decompensation, each of extended duration; or

(2) A residual disease process that has resulted in such marginal adjustment that even a
minimal increase in mental demands or change in the environment would be
predicted to cause the individual to decompensate; or

(3) Current history of 1 or more years' inability to function outside a highly supportive
living environment, with an indication of a continued need for such arrangement.

20 C.F.R. pt. 404 Subpt. P, app. 1 § 12.04(C).

The criteria for part C of Listing 12.06 is met when the medical evidence demonstrates

that the claimant has a "complete inability to function independently outside the area of one's

home."  Plaintiff argues that the ALJ did not evaluate the part C criteria for listing 12.06 at all

and that this omission constituted reversible error.

Regarding paragraph C of the listings, the ALJ stated the following:

* * * I have also considered whether the "paragraph C" criteria are satisfied.  In
this case, the evidence fails to establish the presence of the "paragraph C" criteria.
The claimant has not had repeated episodes of decompensation for extended
durations, had a residual disease process that has resulted in such marginal
adjustment that even a minimal increase in mental demands or changes in the
environment would be predicted to cause him to decompensate.  Additionally, the
claimant has not required placement in a highly supportive living arrangement or

25

had a history of one or more years' inability to function outside a highly
supportive living arrangement.

(Tr. 168)  In this brief explanation, the ALJ basically lists the criteria for "paragraph C" for listing 12.04 and concludes that plaintiff does not meet the criteria.  She does not explain her analysis or point to any evidence in the record supporting her conclusions.  Moreover, as pointed out by plaintiff, the ALJ does not even mention the paragraph C criteria for Listing 12.06.

Defendant argues that the ALJ explained her finding for the paragraph C criteria and relied on the facts that plaintiff did yard work and worked on cars.  Defendant also points to the opinion of Dr. Kelly that plaintiff was capable of performing simple tasks outside the home.  However, a review of the ALJ's decision shows that the ALJ mentioned the facts regarding plaintiff doing yard work when analyzing the part B section related to activities of daily living.  There is no explanation that she also considered these facts in considering the part C criteria or that these facts would have even demonstrated that plaintiff was capable of functioning independently outside the area of his home.  Nor is there any indication that the ALJ relied on the opinion of Dr. Kelly in this part of her analysis.

Conversely, there is evidence in the record demonstrating that plaintiff has great difficulty leaving his home without some type of anxiety response, agitation, or offensive reaction.  The ALJ recognized these facts in evaluating the social functioning section of the Part B analysis.  The record shows that plaintiff is always accompanied by his wife when he leaves the home.  The record also shows that he has displayed symptoms of anxiety, such as skin picking.

Given the absence of a sufficient explanation for the ALJ's Paragraph C conclusion and

26

the existence of evidence that the claimant may meet the criteria of Paragraph C[2], this court should conclude that the ALJ has not articulated a sufficient basis enabling the court to determine whether the ALJ's Paragraph C conclusion is supported by substantial evidence. *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984)

While the ALJ's failure to correctly evaluate the "paragraph C" criteria can be construed as harmless error in some instances, in this case the conflicting evidence related to plaintiff's ability to function independently outside his home merits a remand to the Commissioner to fully consider the paragraph C criteria for listings 12.04 and 12.06.  See *Rabbers v. Comm'r SSA*, 582 F.3d 647, 657 (6th Cir. 2009)

### C.  Treating Physician Rule

Plaintiff also argues that the ALJ did not articulate good reasons for failing to assign controlling weight to the opinion of plaintiff's treating providers.  The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

---

[2] Assuming, without deciding, that essential restriction to one's home *could* be a "highly supportive living environment within the meaning of Paragraph C of the 12.00 Listings).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and

must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996

WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> the conflicting substantial evidence must consist of more than the medical
> opinions of the nontreating and nonexamining doctors. Otherwise the treating-
> physician rule would have no practical force because the treating source's opinion
> would have controlling weight only when the other sources agreed with that
> opinion. Such a rule would turn on its head the regulation's presumption of giving
> greater weight to treating sources because the weight of such sources would hinge
> on their consistency with nontreating, nonexamining sources.

*Id*. at 377.  On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor

analysis."  See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Christine Jaworski, CNP, completed a medical source statement on January 17, 2014.

(Tr. 709-714)  Plaintiff concedes that Ms. Jaworski was not an "acceptable medical source."

(Doc. 10, p. 16)  However, he argues that, since she had treated plaintiff regularly since 2011,

her opinion should have been given some weight.

The ALJ did consider Ms. Jaworski's opinions and afforded little weight to them.  (Tr.

178)  The ALJ fully explained his reasoning for rejecting the medical source statement related to

plaintiff's physical limitations.  (Tr. 178)  With regard to Ms. Jaworski's opinion related to

plaintiff's mental impairments, the ALJ stated,

> Limited weight is accorded to her opinion as the totality of the evidence supports
> the claimant being able to adequately perform, at least, simple instructions.  With
> respect to his ability to interact socially, the medical evidence, including Ms.
> Jaworski's own progress notes, supports that the claimant may have occasional
> interaction with others, including supervisors and co-workers, as long as there is
> no working in tandem or team and no contact with the general public.  The
> claimant has been able to successfully watch his minor children, to care for their
> needs, to interact with his wife and her family, and to interact with others of his
> choosing via email and phone.  Further, he is able to handle the day-to-day

changes in routine that are required when raising children and dealing with household matters.  This shows that he is able to perform routine tasks that are repetitive in nature with few and expected changes.

(Tr. 178)

It is well-established that nurse practitioners, such as Ms. Jaworksi, are not "acceptable medical sources." See e.g. *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007); *Salyer v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 108672, 2012 WL 3156986 at * 5 (S.D. Ohio Aug. 3, 2012); *Wagner v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 102504, 2012 WL 3023266 at * 12 (N.D. Ohio July 24, 2012). Rather, a nurse practitioner is an "other source" pursuant to 20 C.F.R § 416.913(d)(1), which is neither entitled to controlling weight nor subject to the "good reasons" requirement of the treating physician rule. See SSR 06-03p, 2006 SSR LEXIS 5 at *4, 2006 WL 2329939 at * 2; *Everett v. Comm'r of Soc. Sec*., 2012 U.S. Dist. LEXIS 121823, 2012 WL 3731388 at * 11 (S.D. Ohio Aug. 28, 2012).  The ALJ considered Ms. Jaworski's opinion and provided an explanation for affording limited weight to it.  Plaintiff has conceded that the ALJ was not required to treat Ms. Jaworski as an acceptable medical source.  Nonetheless, the ALJ provided an explanation as to her reasons for limiting the weight to be given to Ms. Jaworski's opinion.  The court should find no error in the ALJ's evaluation of Ms. Jaworski's opinion.

Plaintiff's treating psychiatrist, Dr. Ruth S. Elrukar, M.D., also completed a medical source statement on January 22, 2014.  (Tr. 715-721)  Plaintiff argues that the ALJ should have assigned controlling weight to this opinion as it was consistent with the medical record as a whole.  Regarding Dr. Elrukar's opinion, the ALJ states,

> Little weight is afforded to the doctor's opinion, as it was not accompanied by any records that support the severe limitations imposed.  As has been discussed above, the objective record does not support an inability to perform simple tasks or to

30

respond appropriately to a work routine, as the claimant has not reported any
instance of being unable to care for his personal needs or to care for his family.
Further, the claimant has reported activities, such as watching television, playing
cards, board games and videogames, and shopping by telephone and internet.
These facts support the determination that the claimant can perform, at minimum,
simple tasks in a routine environment with few changes and with the tasks not
controlled by an external source.  While the claimant has demonstrated difficulty
interacting with others, he is able to interact successfully with familiars, i.e., his
immediate family, his wife's family and his medical providers.  Additionally, no
significant limitations were observed during the hearing as the claimant answered
all questions posed to him and participated in the hearing process.  However, due
to his anger and hostility issues, interaction with the general public has been
excluded and he is to have only limited interaction with his coworkers or
supervisors.  I further note that there is no indication that this doctor is treating the
claimant for any physical impairment, thus does not have the clinical knowledge
to impose any limitations due to his physical impairments.

The ALJ has provided reasons for rejecting the opinion of Dr. Elrukar and, while there

may be good reasons to reject this opinion, the reasons stated by the ALJ are lacking in

specificity and substantial support in the record.  For example, the ALJ states that the  record

does not support that plaintiff is unable to perform simple tasks or to respond appropriately to a

work routine.  She then points to the facts that the claimant has not reported any instance of

being unable to care for his personal needs or to care for his family.  The ALJ does not explain

how these facts relate to one another.  The fact that plaintiff can care for his personal needs and

his family does not necessarily demonstrate that he would have the psychological wherewithal to

perform tasks in a work routine away from home.  Without a better explanation, these facts seem

to be unrelated.  Similarly, there is no explanation as to how watching TV, playing cards, board

games, videogames and shopping on the internet, all activities performed at his home, directly

contradict Dr. Elrukar's opinion regarding plaintiff's ability to perform tasks away from home in

the workplace.

The ALJ recognized that the record demonstrated that plaintiff had "difficulty interacting

with others, however she noted that "he is able to interact successfully with familiars, i.e. his immediate family, his wife's family, and his medical providers."  While there is some evidence that plaintiff is able to interact with his family, the evidence about plaintiff's interaction with his medical providers is questionable.  The record shows that plaintiff never went to appointments without his wife and that she frequently answered all the questions for him.  (Tr. 167)  Moreover, when the ALJ considered and afforded great weight to the opinion of Dr. J. Bruce Kelly, M.Ed., she stated that the claimant was able to appropriately interact with Mr. Kelly.  (Tr. 176) However, in describing plaintiff's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting, Mr. Kelly's report states the following:

> He related in a guarded manner.  He was distant and remained standing throughout the interview.  He insisted his wife remain with him.  He avoided eye contact.  His responses were terse.  He did not demonstrate spontaneous language. These behaviors will reduce his ability to respond socially in a work setting.

Without more of an explanation from the ALJ, the court cannot understand how she came to the conclusion that plaintiff successfully interacted with his medical providers.  Finally, the ALJ bases part of her decision to afford little weight to Dr. Elrukar's opinion on her own observations of plaintiff during the administrative hearing.  To the extent the ALJ made any medical inferences about the plaintiff based on her observations of him at the hearing, this was improper. An ALJ does not have the expertise to make medical judgments and may not substitute lay observations for expert medical evidence.  "ALJs are not mental health experts.  Depression, anxiety and other mental health disorders require specialized training to evaluate and diagnose." *Winning v. Comm'r of Social Security*, 661 F. Supp.2d 807, 823 (N.D. Oh. 2009).

Here, the ALJ's reasons for assigning little weight to plaintiff's treating physician are not sufficiently specific to make clear to the plaintiff or this court the reasons for the weight

32

assigned.  Her failure to point to specific relevant reasons for discounting Dr. Elrukar's opinion denotes a lack of substantial evidence.  This error is compounded in the current case because the physician's opinions are corroborated by the opinions of the nurse practitioner who had the greatest amount of contact with the patient.  And, as noted above, it is insufficient to merely point to alternative opinions of consultative examiners.  *See Rogers,* 486 F.3d at 243.

The purpose of the "good reasons" requirement is two-fold.  First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly where a claimant knows that his physician has deemed him disabled and therefore "might be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied."  *Rogers,* 486 F.3d at 242 (quoting *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.

The court recognizes that, in some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error."  These circumstances are present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation.  "*Wilson,* 378 F.3d at 547.  *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other

33

opinions or his analysis of the claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."  *Friend,* 375 Fed. Appx. at 551.

Here, there are elements of the ALJ's reasoning for rejecting the opinion of Dr. Elrukar that have not been adequately explained.  Thus, without further explanation from the ALJ as to her reasons for discounting Dr. Elrukar's opinion, it is unclear why it was not assigned greater weight.  Accordingly, the court finds that the ALJ's failure to provide sufficiently specific "good reasons" for discounting Dr. Elrukar's opinion as to the limitations of Mr. Dotson was not harmless error.  Although there may have been good reasons to reject Dr. Elrukar's opinion, the ALJ failed to articulate those reasons with sufficient specificity so as to allow for meaningful review.  Accordingly, the court should reject this portion of the ALJ's analysis.

### D.  Credibility of Ms. Dotson

Finally, plaintiff argues that the ALJ erred in weighing the testimony from plaintiff's wife and in failing to stay what weight, if any, was given to her testimony.  Perceptible weight must be given to lay testimony where it is fully supported by the reports of the treating physicians. *Lashley v. Sec'y of H.H.S.,* 708 F2d 1048, 1054 (1983).  However, the ALJ's decision specifically states that she had considered the testimony of claimant's wife and had afforded it "some weight."  (Tr. 181)  The ALJ acknowledged that the record supported Ms. Dotson's testimony in that plaintiff had issues with anxiety, anger and paranoia.  (Tr. 181)  However, she also noted that Ms. Dotson's testimony was based on her interpretation of the claimant's actions

34

and that Ms. Dotson was not a qualified medical professional. (Tr. 181)  The ALJ was not permitted to construe Ms. Dotson's observations as medical observations or opinions.  (Tr. 181)  The court finds no error in the ALJ's evaluation of Ms. Dotson's testimony.  The testimony was considered and given some weight, but it was not elevated to the weight afforded to a medical professional.

## VII.    Conclusion

For the foregoing reasons, it is recommended that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.


Dated: June 16, 2016                         s/Thomas M. Parker_____
                                             Thomas M. Parker
                                             United States Magistrate Judge

_____

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**